# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF OHIO
### WESTERN DIVISION AT DAYTON

MICHAEL LAWSON,                    :

     Plaintiff,                    :

                                 Case No. 3:14cv00229

vs.                               :

                                 District Judge Walter Herbert Rice

CAROLYN W. COLVIN,                :   Chief Magistrate Judge Sharon L. Ovington
Acting Commissioner of the Social
Security Administration,          :

     Defendant.                    :

---

# REPORT AND RECOMMENDATIONS[1]

---

## I.    Introduction

Plaintiff Michael Lawson brings this case challenging the Social Security

Administration's denial of his application for Supplemental Security Income.  He asserts

here, as he did before the Administration, that severe pain and numbness from diabetic

neuropathy, together with his other health problems, preclude him from working.  Plaintiff

contends that Administrative Law Judge (ALJ) Christopher L. Dillon failed to evaluate his

treating physician Dr. Chang's opinions as required by law and that substantial evidence

does not support ALJ Dillon's determinative findings.  The Commissioner contends the

substantial evidence supports ALJ Dillon's decision, which likewise applied the correct

---

[1] Attached hereto is a NOTICE to the parties regarding objections to this Report and Recommendations.

legal criteria.

The case is presently before the Court upon Plaintiff's Statement of Errors (Doc. #9), the Commissioner's Memorandum in Opposition (Doc. #11), the administrative record and supplemental administrative record (Doc. #s 8, 12), and the record as a whole.

## II.    **Background**

### A.    **Plaintiff and His Testimony**

Plaintiff asserts that beginning on January 1, 2004, he has been under a "disability." Plaintiff protectively filed his application for Supplemental Security Benefits on July 28, 2011. He was 50 years old on that date and was therefore considered a person "closely approaching advanced age" under Social Security Regulations. He has a 7th-grade, or limited, education. He worked in years gone by as an automobile mechanic.

Plaintiff's significant health problems include Type II Diabetes with resulting neuropathy, pain, and numbness in his extremities. During a hearing held by ALJ Dillon, the following colloquy occurred.

> Q [ALJ]      Okay. It looks like your biggest problem is the neuropathy.
>
> A [Plaintiff]  The neuropathy, and I've got a bad leg also. I've got a plate in my leg, and I've got screws sticking literally out of my skin that need – I just, my legs are in real bad shape from the neuropathy in my feet, and my hands.
>
> Q      You do have neuropathy in all four extremities?
>
> A      Yes, I do sir....

(Doc. #8, *PageID* 77-78). Neuropathy limits Plaintiff's ability to stand. He "can't stand

2

long enough to do anything ....” *Id*. at 78.  He feels a stinging pain in his feet, like bees are

stinging him all the time.  He has numbness from the middle of his thighs down to his feet.

With every step he takes, he feels numbness through his legs.  *Id*.  These problems had

become a lot worse during the few months or years before the ALJ's hearing in February

2013.  Plaintiff explained:

> It's gotten a lot worse.  I could – my doctor put me on a cane.  He
> gave me a prescription for a cane about two-and-a-half, three months ago.
> And I was having a hard time before then, but ... it's just real bad.  I mean,
> even there for a while I could get up and walk across my living room and go
> to the bathroom without having to use my cane....

*Id*.  Before he started using the cane, he had a hard time and was unable to walk anyplace

far.  He explained that he did not get a cane before this because he was not active and

because he did not know how to get a cane.  *Id*. at 79.

The ALJ doubted Plaintiff's actual need to use a cane based on a brief note in

Plaintiff's medical records stating, “Patient told by his lawyer to get a cane.”  *Id*. at 355.

The ALJ asked Plaintiff:

> Q [ALJ]    So if you needed a cane for quite a while is the only difference in
> November 2012 is that your attorney told you to go to get a cane?
>
> A [Plaintiff]  No, my attorney didn't tell me to, I asked my doctor if I could get a
> cane, if he thought it would help me.  No, I hadn't talked to an
> attorney until just a couple of days ago.

*Id*. at 79.

Plaintiff testified that in addition to his foot problems, neuropathy caused the

following additional problems:

>Well, for one thing..., the walking, the standing.  Sleeping..., I'd be laying in bed ...[at] night and the neuropathy pain hit me so bad – I may sleep three hours a night at the most, when I sleep at all.  It's the, the sharpest pains, it literally feels like somebody had run spikes through my feet, and my legs, and my hands.  I just, I literally have to lay and put pressure on my hands to keep them from hurting.  And it just hurts me so bad I just – just everything about it hurts.

(Doc. #8, *PageID*# 80).  He also loses sleep when he frequently needs to use the restroom during the night due to diabetes.  He sleeps about 3 hours per night.

Plaintiff lives with his fiancé who helps him with certain activities.  She checks the water temperature of his bath to make sure it is not too hot for his feet.  He does not have enough sensitivity in his feet to do this himself.  His fiancé also helps him care for his feet.  He describes her as an "angel."  She does everything he asks her to do.

Plaintiff leaves the house every day and drives his fiancé to and from work.  He stops to get gas when needed, and he will sometimes visit a drive-thru store to get a pop.  He stated, "[T]hat is the extent of my day.  I mean, I'm a tough guy.  I used to love to do yard work and things like that.  I just can't do them anymore."  *Id*. at 82.  He spends his day mainly watching television.  He testified, "That's so sad, but I do."  *Id*.  He cannot stand long enough to do laundry.

His pain is constant.  During the day, he will sit or lie down, then stand up "to get [his] blood flowing a little bit ...," but he must sit right back down or lie down on the couch and watch television.  *Id*. at 85-86.  When the ALJ asked Plaintiff if he elevates his legs, he answered:

4

> I'll put my legs up under the table until the backs of my heels
> and stuff start hurting so bad, and then I'll put my feet down
> onto the floor, and – it's so hard to explain, but sometimes
> when I go to lift my legs up, if I've got my legs crossed,
> they're just so dead and hurt so bad that I don't know which
> leg is on top to move first ....

(Doc. #8, *PageID*# 86).

### B.   Dr. Chang's Opinions

In late January 2013, Plaintiff's treating physician Dr. Chang completed a form titled, "Diabetes Mellitus Medical Source Statement."  *Id*. at 392-99.  He noted Plaintiff's diagnoses as "DM [diabetes mellitus] – uncontrolled with neuropathy, Bipolar Disorder." He characterized Plaintiff's prognosis as "poor, as long as patient continues to be unable to support financially his medications & doctor's appointments."  *Id*. at 392.  His financial difficulties also prevented him from obtaining insulin and neuropathic analgesia, his prescribed treatments.  Plaintiff's symptoms included difficulty walking, extremity pain and numbness, and hyper/hypoglycemic attacks.

Dr. Chang opined that Plaintiff can stand 5 to 10 minutes at a time, stand/walk 2 to 4 hours total, and sit 30 minutes at a time for a total of 4 hours during an 8 hour workday. *Id*. at 394-95.  He must walk around every 30 minutes for 5 to 10 minutes at a time, and he needs the opportunity to shift positions at will from sitting or standing/walking. He will need unscheduled rest breaks approximately every 30 minutes during an 8 hour work shift. *Id*. at 395.  Dr. Chang identified diabetes with "neuropathy severe" as the medical findings that supported the above limitations.  As for Plaintiff's postural limitations, Dr. Chang

opined that Plaintiff can occasionally stoop, crouch, and climb stairs but can never climb

ladders.  He can use his hands and fingers for grasping/turning/twisting and fine

manipulation 20 percent of the time, his arms for reaching in front of his body 15% of the

time, and for reaching overhead 10% of the time.  The medical findings supporting these

postural limitation were, again, "diabetic neuropathy, severe."  (Doc. #8, *PageID* at 395.

Dr. Chang further explained that diabetic lab testing and very poorly controlled A1C.  *Id*.

at 396.  Dr. Chain explained that Plaintiff's "main problem is poor pain control & severe

neuropathy/neuropathic pain from uncontrolled diabetes."  *Id*.  According to Dr. Chang's

estimate, Plaintiff would miss about 3 to 5 days of work per month due to his impairments

or treatment.  *Id*. at 399.

The administrative record contains additional medical records and medical source

opinions.  A detailed description of those records and opinions is unnecessary because the

undersigned has reviewed the entire administrative record and because the ALJ's decisions

accurately identified the relevant records with citations to evidence.

### III.    The "Disability" Requirement and Judicial Review

The Social Security Administration provides Supplemental Security Income to

indigent individuals subject to several eligibility requirements.  Chief among these requires

an applicant to be a "disabled individual."  42 U.S.C. § 1381a; *see Bowen v. City of New

York*, 476 U.S. 467, 470 (1986).  The phrase "disabled individual" – as defined by the

Social Security Act – has specialized meaning of limited scope.  It encompasses "any

medically determinable physical or mental impairment" that precludes an applicant from performing a significant paid job – *i.e.,* "substantial gainful activity," in Social Security lexicon.[2] 42 U.S.C. § 1382c(a)(3)(A); *see Bowen*, 476 U.S. at 469-70.

Judicial review of an ALJ's non-disability decision proceeds along two lines: "whether the ALJ applied the correct legal standards and whether the findings of the ALJ are supported by substantial evidence." *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (6th Cir. 2009); *see Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 745-46 (6th Cir. 2007). Review for substantial evidence is not driven by whether the Court agrees or disagrees with the ALJ's factual findings or by whether the administrative record contains evidence contrary to those factual findings. *Gentry v. Comm'r of Soc. Sec.*, 741 F.3d 708, 722 (6th Cir. 2014); *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007). Instead, the ALJ's factual findings are upheld if the substantial-evidence standard is met – that is, "if a 'reasonable mind might accept the relevant evidence as adequate to support a conclusion.'" *Blakley*, 581 F.3d at 407 (quoting *Warner v. Comm'r of Soc. Sec.*, 375 F.3d 387, 390 (6th Cir. 2004)). Substantial evidence consists of "more than a scintilla of evidence but less than a preponderance . . . " *Rogers*, 486 F.3d at 241; *see Gentry*, 741 F.3d at 722.

The other line of judicial inquiry – reviewing the correctness of the ALJ's legal criteria – may result in reversal even when the record contains substantial evidence

---

[2] In addition, the impairment must be one "which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 1382c(a)(3)(A).

supporting the ALJ's factual findings.  *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 651 (6th Cir. 2009); *see Bowen*, 478 F.3d at 746.  "[E]ven if supported by substantial evidence, 'a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.'"  *Rabbers*, 582 F.3d at 651 (quoting in part *Bowen*, 478 F.3d at 746, and citing *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 546-47 (6th Cir. 2004)).

## IV.    ALJ Dillon's Decision

To determine if an applicant for Supplemental Security Income is under a benefits-qualifying disability, the Social Security Administration employs a 5-step sequential evaluation.  *See* 20 C.F.R. §416.920(a)(4); *see also Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007).  Boiled down to its core, the evaluation asks:

1.    Has the applicant been paid to work recently?  If not,

2.    Does the applicant have at least one severe impairment?  If so,

3.    Do the applicant's health problems automatically qualify him or her for disability benefits under the Commissioner's Listing of Impairments? If not,

4.    What is his/her residual functional capacity – *i.e.*, the most the applicant can do on the job despite his/her impairments?  And, given these abilities, can the applicant perform his/her past relevant work? If not,

5.    Are there a significant number of jobs available that the applicant can do?

*See* 20 C.F.R. §416.920(a)(4); *see also Bowen,* 476 U.S. at 470-71; *Gayheart v. Comm'r of Soc. Sec.*, 710 F3d at 374-75.

8

ALJ Dillon began his sequential evaluation by answering Step 1 – no recent paid work; Step 2 – yes, including diabetes mellitus with neuropathy; and Step 3 – no listing-level impairment.

ALJ Dillon then turned to Step 4 and assessed Plaintiff's residual functional capacity, or the most he can do in a work setting despite his limitations. ALJ Dillon concluded:

> The claimant retains the residual functional capacity for work that involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds; pushing or pulling similar amounts; standing, walking, and sitting for 6 hours each; no foot pedal operation; no more than frequent handling and fingering; no more than occasional exposure to environmental extremes, such as dust, gas, fumes, heat, cold, humidity; no more than occasional interaction with supervisors, coworkers, and the public; and no more than simple, routine, repetitive tasks.

(Doc. #12, *PageID* # 594). With this in mind, the ALJ found that Plaintiff could not perform his past relevant work as an automobile mechanic.

At step 5 of the sequential evaluation, ALJ Dillon found that given Plaintiff's age, education, work experience, and residual functional capacity, a significant number of jobs exist in the national economy that he could perform. This led to ALJ Dillon's ultimate conclusion that Plaintiff was not under a benefits-qualifying disability.

## V. <u>Discussion</u>

Plaintiff contends that the substantial evidence does not support the ALJ's evaluation of treating physician Dr. Chang's opinions and the ALJ's evaluation was inconsistent with the primary significance the Social Security Administration places on the

opinions of treating physician, particularly in its regulations.   The Commissioner maintains that the ALJ properly found that Dr. Chang's opinions were entitled to little weight because his "extreme conclusions ... were inconsistent with other evidence in the record, including his own treatment notes."  (Doc. #11, *PageID*# 578).

Social security regulations recognize several different types of medical sources: treating physicians and psychologists, nontreating yet examining physicians and psychologists, and nontreating/record-reviewing physicians and psychologists.  *Gayheart v. Comm'r Social Sec.*, 710 F.3d 365, 375 (6th Cir. 2013).

> As a general matter, an opinion from a medical source who has examined a claimant is given more weight than that from a source who has not performed an examination (a "nonexamining source"), and an opinion from a medical source who regularly treats the claimant (a "treating source") is afforded more weight than that from a source who has examined the claimant but does not have an ongoing treatment relationship (a "nontreating source").  In other words, "[t]he regulations provide progressively more rigorous tests for weighing opinions as the ties between the source of the opinion and the individual become weaker."  Soc. Sec. Rul. No. 96–6p, 1996 WL 374180, at *2 (Soc. Sec. Admin. July 2, 1996).

*Gayheart*, 710 F.3d at 375 (citations omitted).[3]  To effect this hierarchy, the Regulations adopt the treating physician rule.  The rule is straightforward:

> Treating-source opinions must be given "controlling weight" if two conditions are met: (1) the opinion is "well supported by medically acceptable clinical and laboratory diagnostic techniques" and (2) the opinion "is not inconsistent with other substantial evidence in [a claimant's] case record."

---

[3] The Social Security Administration has re-lettered 20 C.F.R. §416.927 without altering the treating physician rule or other legal standards  The re-lettered version applies to decisions, like ALJ Motta's, that issued on or after April 1, 2012.

10

*Gayheart*, 710 F.3d  at 376 (citation omitted); *see Gentry*, 741 F.3d at 723.  If both conditions do not exist, the ALJ's review must continue:

> When the treating physician's opinion is not controlling, the ALJ, in determining how much weight is appropriate, must consider a host of factors, including the length, frequency, nature, and extent of the treatment relationship; the supportability and consistency of the physician's conclusions; the specialization of the physician; and any other relevant factors.

*Rogers*, 486 F.3d at 242 (citing *Wilson*, 378 F.3d at 544).

The regulations also require ALJs to provide "good reasons" for the weight placed upon a treating source's opinions.  *Wilson*, 378 F.3d at 544.  This mandatory "good reasons" requirement is satisfied when the ALJ provides "specific reasons for the weight placed on a treating source's medical opinions."  *Id*. (quoting Soc. Sec. Rul. 96-2p, 1996 WL 374188 at *5 (1996)).  The goal is to make clear to any subsequent reviewer the weight given and the reasons for that weight.  *Id*.  Substantial evidence must support the reasons provided by the ALJ.  *Id*.

In the present case, ALJ Dillon placed no deferential weight on Dr. Chang's opinions under the treating physician rule and, instead, placed "little weight" on Dr. Chang's opinions.  The ALJ first observed that the record showed only 5 visits with Dr. Chang since March 2012.  Although this number is accurate, those visits occurred between March 2012 and late January 2013.  Consequently, the length of this treatment period was 10 months and the frequency of visits was once every 2 months.  The ALJ was silent about the latter fact, which Plaintiff correctly characterizes as an "impressive amount of

treatment." *See* Doc. #9, *PageID#* 560 (emphasis omitted).  Even more to the point, by looking only at the number of visits rather than considering the high frequency and concomitant impressive amount of treatment these visits involved, the ALJ erred by overlooking evidence that favored the conclusion that Dr. Chang had a more complete and accurate picture of Plaintiff's health problems and limitations than any other medical source of record.  *Loza v. Apfel*, 219 F.3d 378, 393 (5th Cir. 2000) ("ALJ must consider all the record evidence and cannot 'pick and choose' only the evidence that supports his position."); *see Minor v. Comm'r of Soc. Sec.*, 513 Fed. App'x 417, 435 (6th Cir. 2013) (reversing where the ALJ "cherry-picked select portions of the record" rather than doing a proper analysis); *Germany–Johnson v. Comm'r of Soc. Sec.*, 313 Fed. App'x 771, 777 (6th Cir.2008) (finding error where the ALJ was "selective in parsing the various medical reports").

Two other physicians upon whom the ALJ relied were Dr. Das and Dr. Teague. They considered much less information than Dr. Chang because they reviewed the record for the Ohio Bureau of Disability Determinations on December 21, 2011 and June 18, 2012, respectively.  Their reviews thus occurred well before much of Dr. Chang's treatment and well before he provided his opinions in January 2013.  The ALJ did not consider this limited picture of Plaintiff's health problems that Drs. Das and Teague had when compared to the more complete and longitudinal picture provided to Dr. Chang by Plaintiff's frequent office visits and past medical records.

12

ALJ Dillon next concluded that Dr. Chang's opinions were "unsupported by objective signs and findings in the preponderance of the record."  (Doc. #12, *PageID*#600).  The ALJ explained:

> [T]he primary care progress notes, as well as the hospital treatment notes, generally show only some tenderness to palpation, decreased sensation, and sensitivity to touch in the lower extremities.  The limitations suggested by Dr. Chang are out of proportion with these findings, and...., I find that the limitation to a reduced range of light work adequately accounts for the claimant's diabetes, neuropathy, and respiratory condition....

*Id*.  Substantial evidence does not support this reason for discounting Dr. Chang's opinions.  Dr. Chang's treatment notes on May 23, 2012 document that Plaintiff had "[n]o sensation below knee for light touch & pin prick.  Exquisite sensitivity in bilateral feet to light touch. * These findings ... have been stable since last visit."  *Id*. at 367.  Dr. Chang's treatment notes document the same findings on September 12, 2012.  *Id*. at 363.  These are the objective signs and symptoms of neuropathy caused by Type II diabetes.  *See* http://www.mayoclinic.org (Search for: diabetic neuropathy symptoms).  Plaintiff, moreover, testified that his symptoms are often more severe during the night, as is often the case with peripheral neuropathy caused by Type II diabetes.  *See id*.

The ALJ is factually correct to recognize that treatment notes document some tenderness to palpation, decreased sensation, and sensitivity to touch in the lower extremities.  But the ALJ incorrectly minimized this by finding "only some..." tenderness to palpation, etc., then essentially finding that the symptoms were not severe enough to support Dr. Chang's opinions.  These symptoms, however, are typical of patients with

13

diabetic neuropathy and, in the present case, cannot be reasonably read as contrary to Dr. Chang's opinions.

The evidence the ALJ points to is not as damning to Dr. Chang's opinions as the ALJ found. For example, the ALJ noted that during Plaintiff's hospitalization for chest pain in July 2010, "an examination of the extremities showed no edema or other abnormalities, and a neurological exam showed no weakness." (Doc. #12, *PageID*# 596 (citing Exhibit 1F, pages 20-22 (*PageID*#s 289-90)). One problem here is that edema is not a sign or symptom of neuropathy. *See* http://www.mayoclinic.org (Search for: diabetic neuropathy symptoms); *see also*, TABER'S CYCLOPEDIC MEDICAL DICTIONARY, p. 1387 (19th ed. 2001). As a result, its absence does not conflict with Dr. Chang's opinions. Additionally, the ALJ's finding of "no ... other abnormalities" overlooks that physicians were performing a 14-point review of systems rather than a detailed neurological examination or an attempt to assess the existence and severity of Plaintiff's neuropathy. The reason, moreover, that Plaintiff was in the hospital at that time was chest pain. It is therefore not surprising that the focus of the examination was focused more on Plaintiff's cardiac symptoms and functioning and less on delving into detailed findings regarding his other "systems." *See id*. As to the lack of neurological weakness, this note as it appears in the medical record is too general for a non-medical layperson to reasonably understand that it as saying anything probative about the severity of Plaintiff's neuropathy symptoms.

The ALJ's decision continues in this manner by seeming to stretch certain limited aspects of Plaintiff's medical records to support the ALJ's non-disability conclusion.  In the next paragraph, the ALJ states that a cardiac workup in June 2011 "showed no abnormalities ...."  *Id.* at 596.  This note is too general to be relevant to the severity of Plaintiff's neuropathy and related symptoms.  The ALJ next states, "Although a neurological examination shows stocking distribution of the feet, there were no areas of focal weakness."  *Id.*  The medical records do not indicate the significance of "no areas of focal weakness," and the ALJ does not cite evidence in the record indicating that such a finding is contrary to Dr. Chang's opinions.

The ALJ also repeatedly referred to the fact that Plaintiff was not taking insulin.  *Id.* The ALJ reported, for instance, that in July 2010, Plaintiff had not taken insulin in approximately six months, due to lack of insurance..."; in June 2011, Plaintiff "admitted to medication non-compliance for the past two months..."; in late July 2011, Plaintiff "had stopped taking diabetic medications provided for him at the recent [hospital] discharge, despite their 'availability on the $4 medication lists at multiple pharmacies.'"  *Id.* (brackets and citations omitted).  None of these records indicate that Plaintiff was being disingenuous or uncooperative with physicians by not taking medications or insulin.  The record, instead, shows that Plaintiff lacked health insurance and often did not have money to pay for insulin or medications or doctor visits.  This appears, for example, in July 2010 records – "Patient states that he has not been on any medications in the past 6 months

secondary to no insurance...." *Id*. at 289. Dr. Weeks noted, in late July 2011, that Plaintiff

had stopped taking the medication he received upon his hospital discharge "due to their

costs despite their availability on the $4 med[ication] lists at multiple pharmacies." (Doc.

#8, *PageID*# 318). When read in context, Dr. Weeks was not suggesting that Plaintiff was

being non-compliant or dishonest, as the ALJ apparently thought. Instead, Dr. Weeks was

essentially reporting that the prescribed medications Plaintiff needed were too expensive

for him to afford even though the cost was low. This is consistent with Dr. Chang's

treatment notes stating, "Patient does have history of severe diabetic neuropathy that is

poorly controlled, again due to financial burden." *Id*. at 355. And it is consistent with Dr.

Chang's prognosis, which he rated as "poor, as long as patient continues to be unable to

support financially his medications and doctors' appointments." *Id*. at 392.

The ALJ was skeptical of Plaintiff's need for a cane even though the ALJ

acknowledged that Dr. Chang found it reasonable for Plaintiff to have a cane due to his

balance issues and severe diabetic neuropathy. (Doc. #12, *PageID*# 597). The ALJ

reasoned that Dr. Chang's opinion was "unsupported by the progress notes. In fact, Dr.

Chang documented a relatively normal physical examination at that time." *Id*.

The ALJ relied on his own non-medical lay opinion in rejecting Dr. Chang's

opinion about Plaintiff's need for a cane. The ALJ's description of Dr. Chang's

examination results as "relatively normal," overlooks or ignores the fact that Dr. Chang

found hypersensitivity in Plaintiff's feet and diminished or no sensation to light touch and

16

pinprick along the bilateral lower extremities.  These examination results were consistent with the previous hospital findings that revealed a stocking distribution in Plaintiff's feet. These findings support Dr. Chang's opinion that Plaintiff requires a cane to ambulate. There is also nothing in these examination findings to suggest that a cane is not necessary and no medical opinion disagreeing with Dr. Chang's opinion about the help a cane will provide Plaintiff.  Instead, on November 16, 2012, Dr. DeRussy noted that he agreed with Dr. Chang's findings.  (Doc. #8, *PageID#* 356).  Dr. DeRussy also observed that Plaintiff "could be a fall risk," and Dr. DeRussy "[c]ertainly agree[s] that a cane would be useful to him if he is feeling unsteady ...." *Id*.

The Commissioner observes that Plaintiff requested a cane from Dr. Chang only after his attorney advised him to.  Yet, Plaintiff explained during his testimony that he did not know how to get a cane.  This is not surprising in light of Plaintiff's limited education. Assuming Plaintiff's attorney told him he needed a cane and instructed him to ask Dr. Chang for a cane, there was nothing facially nefarious about this instruction.  Without evidence indicating that counsel's advice was given for an improper purpose, it is reasonable to concluded that the instruction grew from counsel's genuine concern about Plaintiff's health, especially in light of counsel's ethical duty of candor to the administrative tribunal.  *See* Rule 3.3, Ohio R. Prof. Cond.  And, it is within an attorney's professional ethical boundaries to make such a non-legal recommendation.  *See* Ohio

Rules of Prof. Cond., Rule 2.1, comment 4.[4]  This is especially true here where it turns out that at least two physicians, Dr. Chang and Dr. DeRussy, believed that Plaintiff's long-experienced symptoms of neuropathy places him at risk for falling and supports his need for a cane.

Accordingly, Plaintiff's Statement of Errors is well taken.

## VI.  Remand For Benefits Is Warranted

A remand is appropriate when the ALJ's decision is unsupported by substantial evidence or when the ALJ failed to follow the Administration's own regulations and that shortcoming prejudiced the plaintiff on the merits or deprived the plaintiff of a substantial right.  *Bowen*, 478 F3d at 746.  Remand may be warranted when the ALJ failed to provide "good reasons" for rejecting a treating medical source's opinions, *see Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 545-47 (6th Cir. 2004); failed to consider certain evidence, such as a treating source's opinions, *see Bowen*, 478 F3d at 747-50; failed to consider the combined effect of the plaintiff's impairments, *see Gentry*, 741 F.3d at 725-26; or failed to provide specific reasons supported by substantial evidence for finding the plaintiff to lack credibility, *Rogers*, 486 F.3d at 249.

Under sentence 4 of  42 U.S.C. §405(g), the Court has authority to affirm, modify, or reverse the Commissioner's decision "with or without remanding the cause for rehearing."

---

[4] *See, e.g.*, Ohio Rules of Prof. Cond., Rule 2.1, comment 4 ("Matters that go beyond strictly legal questions may also be in the domain of another profession....  Where consultation with a professional in another field is itself something a competent lawyer would recommend, the lawyer should make such a recommendation....").

*Melkonyan v. Sullivan*, 501 U.S. 89, 99 (1991).  Consequently, a remand under sentence 4

may result in the need for further proceedings or an immediate award of benefits.  *E.g.,*

*Blakley*, 581 F.3d at 410; *Felisky*, 35 F.3d at 1041.  The latter is warranted where the

evidence of disability is overwhelming or where the evidence of disability is strong while

contrary evidence is weak.  *Faucher v. Sec'y of Health & Humans Servs.*, 17 F.3d 171, 176

(6th Cir. 1994).

      A reversal of the ALJ's decision and a judicial award of benefits are warranted in the

present case because the evidence of disability is either overwhelming or strong while

contrary evidence is weak.  *See Faucher*, 17 F.3d at 176.  There is no medical source

opinion in the record contrary to the opinion of Dr. Chang regarding the impact Plaintiff's

severe neuropathy and resulting symptoms have on his work abilities except for record-

reviewers Drs. Das and Teague.  They, however, did not have the benefit of Dr. Chang's

opinions, and they lacked many of his treatment notes, when they reviewed the record for

the Ohio Bureau of Disability Determinations.  There is, moreover, no medical source

opinion of record that is contrary to Dr. Chang's opinion – and at least one physician, Dr.

DeRussy, who agreed with Dr. Chang – that Plaintiff's need for a cane was reasonable in

light of his balance issues and danger of falling caused by diabetic neuropathy.  This is

dispositve – or as Plaintiff maintains – outcome determinative due to testimony by the

vocational expert during Plaintiff's administrative hearing.

      The ALJ formulated hypothetical questions based on the light-work abilities and

limitations he identified in his assessment of Plaintiff's residual functional capacity. A hypothetical person with these limitations and abilities would be able to perform thousands of jobs available in the national economy, according to the vocational expert. (Doc. #8, *PageID*# 89-90). The ALJ then added a need for this hypothetical worker to use "an assistive device such as a cane, with either upper extremity, for all standing and walking ...." *Id*. at 91. The vocational expert testified that he could not identify any jobs that such a person could perform. Without a significant number of jobs available to someone with Plaintiff's work abilities and limitations, he is under a benefits-qualifying disability.

Accordingly, for the above reasons, Plaintiff's Statement of Errors is well taken.

## IT IS THEREFORE RECOMMENDED THAT:

1.    The Commissioner's non-disability finding be vacated;

2.    Plaintiff Michael Lawson's application for Supplemental Security Income protectively filed on July 28, 2011 be REMANDED to the Social Security Administration for payment of benefits consistent with the Social Security Act; and

3.    The case be terminated on the docket of this Court.


October 21, 2015

                                              s/Sharon L. Ovington
                                                  Sharon L. Ovington
                                    Chief United States Magistrate Judge

## NOTICE REGARDING OBJECTIONS

Pursuant to Fed. R. Civ. P. 72(b), any party may serve and file specific, written objections to the proposed findings and recommendations within **FOURTEEN** days after being served with this Report and Recommendations.  Pursuant to Fed. R. Civ. P. 6(d), this period is extended to **SEVENTEEN** days because this Report is being served by one of the methods of service listed in Fed. R. Civ. P. 5(b)(2)(C), (D), (E), or (F).  Such objections shall specify the portions of the Report objected to and shall be accompanied by a memorandum of law in support of the objections.  If the Report and Recommendation is based in whole or in part upon matters occurring of record at an oral hearing, the objecting party shall promptly arrange for the transcription of the record, or such portions of it as all parties may agree upon or the Magistrate Judge deems sufficient, unless the assigned District Judge otherwise directs.  A party may respond to another party's objections within **FOURTEEN** days after being served with a copy thereof.

Failure to make objections in accordance with this procedure may forfeit rights on appeal.  *See Thomas v. Arn,* 474 U.S. 140 (1985); *United States v. Walters,* 638 F.2d 947, 949-50 (6th Cir. 1981).